**[Cite as *In re A.U.*, 2023-Ohio-4341.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

In re A.U.

Court of Appeals No.  WM-23-002

Trial Court No.  20202035

**DECISION AND JUDGMENT**

Decided:  December 1, 2023

* * * * *

Katherine Zartman, Williams County Prosecuting Attorney,
for appellee.

Victoria Ferry, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal from the December 16, 2022 judgment of the Williams

County Court of Common Pleas, Juvenile Division, finding appellant, A.U., was not

entitled to credit for being confined for the time he spent at the Marsh Foundation

("Marsh").  For the reasons that follow, we affirm the judgment.

**{¶ 2}** A.U. sets forth one assignment of error:

> The trial court erred when it denied A.U.'s request for confinement credit for his time served at the Marsh Foundation.

## Background

**{¶ 3}** In April 2020, it was reported to the Bryan Police Department that when A.U. was 13 years old, he had sexual contact with a juvenile[1] under 13 years of age. Thereafter, A.U. was charged in juvenile court with one count of gross sexual imposition, a felony of the fourth degree if committed by an adult, based on events which occurred December 20 through December 31, 2018.[2] The charge was then amended to attempted gross sexual imposition, a felony of the fourth degree if committed by an adult. A.U. admitted to the amended charge and was adjudicated delinquent.

**{¶ 4}** At disposition, in September 2020, the court ordered that A.U. be committed to the legal custody of the Ohio Department of Youth Services ("DYS") for a minimum period of 6 months to a maximum of age 21; the commitment was suspended. The court also ordered that A.U. was ordered placed at the Northwest Ohio Juvenile Detention, Training and Rehabilitation Center ("JDC") for 90 days; those days were suspended. The

---

[1] Some of the filings in the record refer to two juvenile victims, yet the complaint filed in juvenile court alleges one victim was involved. We will refer to only one victim.

[2] Some of the filings in the record set forth the events occurred in December 2019, but the complaint alleges A.U. engaged in sexual contact with the victim in December 2018. We will reference the December 2018 time period.

2.

court further ordered that A.U. was placed on probation for 6 months, and he was ordered to comply with all probation provisions.

{¶ 5} In mid-October 2020, A.U. was before the juvenile court and ordered to complete treatment at Marsh. One year later, A.U. was released from Marsh to house arrest. While on house arrest, A.U. was prohibited from possessing a cell phone.

{¶ 6} In late November 2021, A.U. was detained by order of the Williams County Probation Department ("the probation department"), and a hearing was held where the juvenile court found that detention was required as A.U. is a danger to the community and A.U. was not under the reasonable control of a parent at home. The next day, a probation violation was filed based on A.U.'s possession of a cell phone which he used, at school, to access pornographic websites.

{¶ 7} In January 2022, the juvenile court found A.U. violated his probation. The court re-suspended his DYS sentence and ordered A.U. committed to the Juvenile Residential Center of Northwest Ohio ("JRC") for 90 days.

{¶ 8} In late April 2022, A.U. was detained by order of the probation department. In early May 2022, the juvenile court held a hearing and found that detention was required based on A.U.'s failure to adhere to JRC's rules, as he threated bodily harm to another juvenile and directed offensive language towards the staff. Another hearing was held where A.U. was found to be delinquent due to the violation of his probation. Pending disposition of that violation, in early June 2022, A.U. was again detained upon

3.

order of the probation department. The juvenile court held a hearing and found detention of A.U. was required to protect others from immediate or threatened physical or emotional harm, and A.U. was not under the reasonable control of JRC.

{¶ 9} In late June 2022, the juvenile court found A.U. violated his probation. The court ordered A.U. committed to DYS for a minimum period of 6 months, maximum to age 21. Thereafter, A.U.'s probation was terminated.

{¶ 10} On November 1, 2022, A.U.'s counsel filed a motion for recalculation of confinement credit. The state filed a response, then A.U.'s counsel filed a supplement to the motion. On December 16, 2022, a motion hearing ("the Hearing") was held where only one witness, Ben Marse, Program Manager of Marsh, testified. The juvenile court issued a judgment entry, finding that A.U. should receive credit for confinement for the time he spent at JDC and JRC, but should not receive credit for confinement for the time he spent at Marsh, as it is not a secure facility, and does not constitute confinement under R.C. 2152.18(B). A.U. appealed.

## Assignment of Error

{¶ 11} A.U. argues Marsh is a secure facility for youth, and pursuant to R.C. 2152.18(B), the time he spent there constitutes confinement, which should be reflected in his confinement credit.

4.

## Law

**{¶ 12}** R.C. 2152.18(B) provides:

When a juvenile court commits a delinquent child to the custody of the department of youth services [("DYS")] pursuant to this chapter, the court shall state in the order of commitment the total number of days that the child has been confined in connection with the delinquent child complaint upon which the order of commitment is based. The court shall not include days that the child has been under electronic monitoring or house arrest or days that the child has been confined in a halfway house.

**{¶ 13}** The statute further states:

[DYS] shall reduce the minimum period of institutionalization that was ordered by both the total number of days that the child has been so confined as stated by the court in the order of commitment and the total number of any additional days that the child has been confined subsequent to the order of commitment but prior to the transfer of physical custody of the child to [DYS].

**{¶ 14}** Confinement has been defined by the Supreme Court of Ohio as time spent at any facility in which an individual is "not free to come and go as [that individual] wishes." *State v. Napier*, 93 Ohio St.3d 646, 648, 758 N.E.2d 1127 (2001). There, the court addressed whether an adult offender's time in a community-based corrections facility ("CBCF") should be credited against prison time. *Id.* at 647. The court noted

5.

that "[t]he outer doors to the [CBCF at issue] are locked, except for the fire doors, which have an alarm strike panel. There are certain areas within the facility where residents can move about freely; however, there are also restricted areas that residents cannot enter without permission. The outside recreation yard is surrounded by a fence." *Id.* at 646.

{¶ 15} The court relied on its holding in *State v. Snowder*, 87 Ohio St.3d 335, 337, 720 N.E.2d 909 (1999), in which it found that Snowder "was 'confined' * * *while in the CBCF," for purposes of the relevant statute. *Napier* at 647. That statute required that a CBCF "'[b]e a secure facility that contains lockups and other measures sufficient to ensure the safety of the surrounding community.'" *Id.* at 647.

{¶ 16} In *In re K.A.*, 6th Dist. Lucas No. L-12-1334, 2013-Ohio-3847, ¶ 5, this court followed the definition of confinement set forth in *Napier* in deciding whether a juvenile was entitled to credit for time spent at a community corrections facility ("CCF") pursuant to R.C. 2152.18(B).

{¶ 17} Likewise, the court in *In re D.P.*, 1st Dist. Hamilton No. C-140158, 2014-Ohio-5414, ¶ 18, adhered to the definition of confinement set forth in *Napier*, and also elaborated on that definition, it in the context of R.C. 2152.18(B), setting forth a two-prong analysis: (1) "juvenile courts must review the nature of the facility, to see if it is a secure facility with measures sufficient to ensure the safety of the surrounding community," and (2) the court "must also review the nature of the restrictions on the juvenile at the facility to determine if the juvenile was 'free to come and go as he wished'

6.

or if he was 'subject to the control of the staff regarding personal liberties' as contemplated by *Napier*." *Id.* *See also In re M.F.*, 2020-Ohio-109, 151 N.E.3d 981 (8th Dist.).

{¶ 18} In *In re J.C.E.*, 11th Dist. Geauga No. 2016-G-0062, 2016-Ohio-7843, the issue before the court was whether the juvenile court erred by not giving J.C.E. credit for the time he spent in a CCF. The appellate court, citing, inter alia, *Napier*, set forth that a juvenile court can examine the nature of the CCF in order to determine whether restrictions on the juvenile are so stringent as to constitute confinement under R.C. 2152.18(B). *In re J.C.E.* at ¶ 29. The court further set forth that in every aspect of a juvenile's life, the juvenile is not free to come and go as desired, and although a juvenile is subject to the rules of the household and school, some of which may be restrictive, these rules are not restrictions which amount to what it means to be confined under R.C. 2152.18(B). *Id.*

### Standard of Review

{¶ 19} We review a juvenile court's calculation of confinement credit for an abuse of discretion. *In re J.K.S.*, 8th Dist. Cuyahoga No. 101967, 2015-Ohio-1312, ¶8, citing *In re H.V.*, 138 Ohio St.3d 408, 2014-Ohio-812, 7 N.E.3d 1173, ¶ 8, where the Supreme Court of Ohio set forth that "[a] juvenile court's disposition order will be upheld unless the court abused its discretion." An abuse of discretion indicates the court's attitude is

7.

unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## Arguments in Support of Assignment of Error

### A.U.'s Arguments

{¶ 20} A.U. argues that based on the guidance of Ohio courts, Marsh meets the requirements for a secure facility. A.U. insists that while at Marsh, he was confined in a secure facility, under R.C. 2152.18(B), and is entitled to credit for his time served there.

{¶ 21} In support of his arguments, A.U. refers to portions of the Hearing testimony of Marse, Marsh's Program Manager, including the following.

### Marse's Testimony

{¶ 22} Marsh is located in Van Wert County, Ohio, and is about one quarter to half a mile from the neighboring town. Marsh consists of five homes, three of which are occupied only by juveniles. Throughout Marsh, the doors remained locked, "especially the classrooms and offices," so to gain entry, one must push a call button to speak with someone or use a key fob, and residents are not given access to keys for their rooms. In the homes, there are blocks on certain windows to prevent juveniles from engaging in self-harm and attempting to leave.

{¶ 23} When a juvenile is transitioning to any other location on Marsh's grounds, the juvenile is escorted by staff or "there's always communication [between staff members] of sending and receiving [a juvenile] from one person to the next." A juvenile

8.

is in eyesight of staff a majority of the time, or staff "can determine if the child is a safety risk." There is a ratio of two to three juveniles per staff member throughout Marsh's grounds. Staff consistently count residents to ensure everyone is accounted for on Marsh's premises, and to make sure all youth are safe and where they are supposed to be.

{¶ 24} Marsh also has cameras throughout the buildings, which run 24 hours a day. The cameras "cover a vast, vast majority of the areas where there's only very, very few blind spots," and juveniles are "within a camera ninety-five (95) percent of the time." The cameras are backed up to a server so footage can be retrieved at a later date if needed.

{¶ 25} Marsh has specific overnight staff assigned to supervise, and the staff member "is always in an awake position from 10 p.m. to 8," and conducts bed checks six times. If a juvenile needs to get up for water or to use the restroom at night, the juvenile must push a call button in the bedroom which notifies the staff member, on the alarm panel in the office. The notification is accompanied by a beeping sound which continues until the floor is disarmed by the staff member, who then immediately watches the monitor. The monitor displays all of the cameras which show the juvenile "traveling to and from." Upon the juvenile's return to the bedroom, the staff member re-alarms the floor.

9.

**{¶ 26}** Marsh maintains strict protocol for any off-ground required appearances by juveniles, such as medical appointments or court hearings, and juveniles are escorted by legal guardians or staff to and from these activities.

**{¶ 27}** If staff have a suspicion that a juvenile will leave Marsh, or there was a specific threat, staff are required to call police immediately. Marsh is in a rural area, so staff maintain eyesight on the juvenile until the juvenile is returned to Marsh by the police.

**Further Arguments by A.U.**

**{¶ 28}** A.U. contends that he was not able to come and go as he pleased while at Marsh. He maintains the juveniles at Marsh are closely monitored and subjected to staff control regarding personal liberties, and juveniles do not have the freedom to come and go from the homes. In addition, A.U. asserts Marsh maintains distance from its neighboring towns, which ensures community safety.

**State's Arguments**

**{¶ 29}** The state argues Marsh is not a secure facility. The state notes the juvenile court did not find Marsh to be a secure facility, as the court set forth "[i]n all of the incidences [the court] * * * had with that facility that has never been the understanding that the Court considered [it] to be a secured facility * * * it's a group home for youth, it is a treatment opportunity to be used."

**{¶ 30}** In support of its arguments, the state also cites to portions of Marse's testimony, including the following.

**Marse's Testimony**

**{¶ 31}** Marsh is a qualified residential treatment program in a family-oriented setting, focused on providing behavioral treatment and clinical services, not punishment or security. Marsh is not a CCF (community correctional facility), a detention facility or a DYS-alternative.

**{¶ 32}** Marsh residents are supervised by staff, who do not carry weapons or tools to protect themselves from violence by the juveniles. Staff are trained to deescalate and restrain on a matching or lower level than that of the juvenile, only if necessary, and then staff release the juvenile as soon as the danger ceases.

**{¶ 33}** Marsh's property is not secured in a way to keep the juveniles enclosed or to prevent juveniles from entering the nearby community without the approval of the staff, as there are no fences or other structures surrounding the property. Marsh's residents are able to leave the property, and upon return, are searched by staff; sometimes a juvenile returns to Marsh independently, sometimes with the help of local police. Marsh's residents, like any juveniles, are not permitted to run away.

**{¶ 34}** The doors to Marsh's buildings are locked to prevent people from coming in, but there are no locks preventing juveniles from going out, nor are the interior doors locked from persons exiting the rooms.

11.

{¶ 35} Marsh residents are permitted to leave the property to participate in outings, including going to activities with their families and loved ones. Residents can also earn the privilege to go uptown and into the community with greater freedom of movement.

**Further Arguments by the State**

{¶ 36} The state asserts that Marsh does not contain a lock-up or a cell for residents, nor does it have fencing or doors that keep the juveniles locked in, to protect the outside community. The state contends Marsh is no different from any school, group home or treatment facility where juveniles may reside, other than Marsh residents are under the supervision of staff, and if the residents leave the Marsh property, they are returned to Marsh. The state maintains "[t]here is not such a difference beyond the restrictions placed on many juveniles' lives so as to constitute 'confinement' as the legislature intended, or, indeed, as this trial court understood the facility, having apparently visited and utilized the facility on multiple occasions with juveniles previously."

{¶ 37} The state asks that Marsh be recognized for what it holds itself out to be, which is a treatment facility, not a locked, secured, DYS-alternative. The state also requests a finding that the time A.U. spent at Marsh does not constitute confinement for purposes of R.C. 2152.18(B).

12.

## Marse's Additional Testimony

{¶ 38} In addition to the presentation of Marse's testimony by A.U. and the state, we take note of the following testimony.

{¶ 39} Marse has been Marsh's program manager for seven years. Marsh has a total of 30 beds for juvenile residents in three of the homes on the property. Treatment at Marsh can be court-ordered as a condition of a juvenile's probation or parole. Marsh's website for the juvenile sex offender program does not contain the words secure or locked.

{¶ 40} Marse has "never worked in a secured facility," so he did not "know the parameters that would identify something or what would qualify something as a secured facility. Other than the obvious * * * such as, detention centers of something that had physical barriers from them leaving." He was not certain if Marsh is considered a DYS-alternative.

{¶ 41} Marse is familiar with the security measures implemented by Marsh. There are cameras in almost all rooms of the homes, except bedrooms and bathrooms. In the home where A.U. resided, there are 22 cameras. Some of the windows in the homes have blocks, as safety precautions.

{¶ 42} There are usually 30 to 40 juveniles serviced at Marsh during the day, including residents and community clients, and there is, if possible, a ratio of two to three juveniles to one staff member. Juveniles "are outside quite a bit. They play * * *

13.

basketball or any kind of outdoor activity, walking or running, and * * * they have a gym, they have a weight room. They have plenty of opportunity to be outside playing."

{¶ 43} Marsh staff would not physically restrain a juvenile who wants to leave, as Marsh residents "have the option and opportunity to just simply walk out of the building and potentially off campus if they wish." If a Marsh resident "leaves the group home," Marsh has "protocols in place to help with getting them back on campus and reintegrated into the program." If "there's a threat or an assumption that a youth is leaving, whether habit of theirs [sic] or if they [sic] have * * * a history of leaving placements, we call the police immediately and we keep them [sic] in eyesight." If a resident leaves without permission Marsh will not always terminate that resident.

{¶ 44} During violent situations with juveniles, Marsh staff is "not like police * * * where the expectation is to go one step above the behavior." Marsh staff "match the behavior to limit [a juvenile's] range of motion to others."

{¶ 45} Concerning a juvenile's freedom of movement while living at Marsh, "[a]t any time the youth is with a group activity there [sic] in eye sight of a staff member with the exception of simple privileges they [sic] may receive as far as maybe going to the next aisle in a grocery store and things like that." If "a youth gets on a much higher level [i.e., is a low risk] they [sic] do have the opportunity to engage in the community by either walking uptown * * * where they [sic] can go to the gas station or to the library, which is a little over a mile away." A Marsh staff member will conduct a check and

"drive the van and just make sure the juvenile is where they [sic] should be." Also, "when a youth is deemed safe they [sic] can go * * * off campus [for] home visits with * * family or loved ones or things like that."

## Analysis

{¶ 46} Upon review, we have considered the A.U.'s juvenile court record, including the transcript of the Hearing on his motion for recalculation of confinement credit and the juvenile court's December 16, 2022 judgment entry, as well as the relevant law, including R.C. 2152.18(B), the definition of confinement set forth in *Napier*, and the two-prong analysis set forth in *In re D.P.* That analysis will be applied to the evidence presented in A.U.'s case in order to determine if the juvenile court abused its discretion by finding that Marsh is not a secure facility and A.U.'s time there was not considered confinement.

**First Prong - Nature of the Marsh Facility**

{¶ 47} In order to ascertain whether or not Marsh is a secure facility with measures sufficient to ensure the safety of the surrounding community, the nature of the facility must be examined.

{¶ 48} The evidence shows Marsh is in a rural setting, at least one quarter of a mile away from the closest town. There is no fencing around Marsh's property, the buildings' doors have no locks to prevent juveniles from leaving, the windows do not all

15.

have locks or blocks, the doors or windows have no alarms, and there is no lockup cell for juveniles.

{¶ 49} Marsh's program manager testified that he has never worked at a secure facility. Marsh's focus is not on punishment or security, its focus is on behavioral treatment and clinical services for juveniles in a family-oriented setting. The words secure or locked are not used in Marsh's website for the juvenile sex offender program.

{¶ 50} The Marsh staff member to juvenile ratio is one to two or three. Staff members do not carry weapons. Staff eyeball the juveniles during the day, and overnight a staff member alarms the floors and is required by law to conduct six bed checks of the residents. Marsh's cameras run 24-hours a day; there is no evidence the cameras are monitored during the day. At night, the staff member monitors the cameras if notified that a juvenile has to leave the bedroom to use the restroom or get a glass of water. If a juvenile wants to leave Marsh, staff cannot physically intervene to stop the juvenile. When a juvenile does leave, staff watch the juvenile until the juvenile returns, on his own or by the police.

**Findings**

{¶ 51} Considering the foregoing as well as all of the evidence presented at the Hearing and the relevant law, we find the restrictive measures in place at Marsh are not sufficient to ensure the safety of the surrounding community. Marsh's focus is on treatment, not security, and its property is not surrounded by a fence, although juveniles

16.

have plenty of opportunities to be outside to play. The doors to the buildings are locked on the outside only, not all windows have blocks, and there are no alarms on doors or windows. During the day, there are no barriers preventing juveniles from leaving Marsh's buildings or property. Staff use eyesight supervision to monitor juveniles throughout the day, but staff cannot not stop juveniles from leaving the Marsh facility.

**Second Prong - Personal Liberties of the Juveniles**

{¶ 52} In order to determine whether juveniles at Marsh can come and go as they wish, or if they are subject to staff control regarding personal liberties, the nature of the restrictions on the juveniles must be examined.

{¶ 53} The evidence shows Marsh has restrictions while juveniles move around the buildings as the doors are locked, so a key fob or a call button must be used to enter the rooms. To exit the rooms, no fob or call button is needed, as the doors are not locked to keep juveniles in the rooms. In addition, juveniles are escorted by staff or in eyesight of staff when going from one place to another on Marsh's grounds, and staff constantly count residents to make sure juveniles are accounted for, safe, and where they are supposed to be.

{¶ 54} For required activities which juveniles have off-sight, Marsh maintains strict protocols such that juveniles must be escorted by legal guardians or staff to and from these activities.

17.

**Findings**

{¶ 55} We find that juveniles at Marsh have restrictions, which for the most part, are not unlike the rules that juveniles are required to follow at school, and should be following at home. Indeed, Marse testified that Marsh provides a home-like setting for juveniles. While the juveniles at Marsh are not authorized to come and go as they wish and are not allowed to run away, there are no barriers during the day which prevent juveniles from leaving the Marsh property without permission. Moreover, juveniles who decide to leave the premises will not always be terminated from the Marsh program.

{¶ 56} We further find the restrictions on the juveniles at Marsh are not so stringent as to constitute confinement under R.C. 2152.18(B). Marsh has rules which residents are expected to follow, yet if a juvenile wishes to leave Marsh's property, staff members exert no control and have no means of thwarting the juvenile's departure.

**Conclusions**

{¶ 57} The undisputed evidence is that Marsh provides residential treatment for juveniles in a family-oriented setting, focused on behavioral treatment, not punishment or security.

{¶ 58} We conclude Marsh is not a secure facility, as its lack of barriers and restrictive measures that do not ensure the safety of the surrounding community, as juveniles' liberties are not controlled to the extent that they cannot leave Marsh's premises when they please, which poses a potential threat to the community at large.

18.

**{¶ 59}** We further conclude that A.U. was not confined, pursuant to R.C. 2152.18(B), during the time that he spent at Marsh. Therefore, the juvenile court did not abuse its discretion when it determined that A.U. should not receive credit for confinement for the time he spent at Marsh, as it is not a secure facility and does not constitute confinement under R.C. 2152.18(B). Accordingly, A.U.'s sole assignment of error is not well-taken, and we affirm the trial court's judgment. A.U. is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.